Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50317 | **DATE** | 7/2/2002 |
| **CASE TITLE** | CUNNINGHAM vs. BARNHART | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] As stated on the attached, the ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's motion for summary judgment on the administrative record and pleadings is hereby denied. Defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | JUL - 3 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 JUL -2 PM 4:26 | 7/2/2002 | |
| tml | courtroom deputy's initials | FILED-WD Date/time received in central Clerk's Office | date mailed notice ss mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| STEVEN C. CUNNINGHAM, ) | |
| ) | |
| Plaintiff, ) | Case No. 01 C 50317 |
| ) | |
| v. ) | Magistrate Judge |
| ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Steven Cunningham (Plaintiff), seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB) pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §416 (i), §423. The Commissioner also denied Plaintiff's application for Supplemental Security Income (SSI) pursuant to Title XVI of the Act. 42 U.S.C. §1381. This matter is before the Magistrate Judge pursuant to consents filed by both parties on December 21, 2001. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff first filed an application for DIB and SSI on February 18, 1998, alleging an inability to work beginning March 31, 1996, due to hearing loss, tension headaches, lower back pain, and borderline intellectual functioning. (Tr.13). Plaintiff's application for benefits was initially denied on May 12, 1998. (Tr.63-66). On June 1, 1998, Plaintiff filed a request for reconsideration. (Tr.67).

Plaintiff's request for reconsideration was subsequently denied on September 8, 1998. (Tr.68-70). Plaintiff then filed a request for a hearing before an Administrative Law Judge (ALJ) on September 17, 1998. (Tr.71). On March 16, 1999, Plaintiff appeared, with counsel, before ALJ William Wenzel, who heard the testimony of the Plaintiff and a vocational expert. (Tr.28-60). On February 25, 2000, the ALJ issued the decision that Plaintiff was not eligible for Social Security Benefits. (Tr.10-25). On February 29, 2000, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr.8-9). On August 17, 2001, the Appeals Council denied Plaintiff's request for review. (Tr.5-6). Plaintiff then sought review by this court.

## II. FACTS

Plaintiff, born in Rockford on August 6, 1963, is a thirty-eight year old single male who currently resides in Rockford. (Pl.'s mem.at 2). Plaintiff received his education through the ninth grade. (Def.'s mem.at 2). His past work experience includes working as a factory laborer, forklift driver, and a roofer. (Tr.14). Plaintiff claims disability as of March 31, 1996, based upon hearing loss, tension headaches, lower back pain, and borderline intellectual functioning. (Pl.'s mem.at 1).

Plaintiff testified that he suffers from a hearing loss and has had an operation on his right ear. (Tr. 36). Since that operation, he has suffered right ear pain and throbbing and migraine headaches. (Tr. 37-41). When Plaintiff was asked how this condition affected his daily activities, he stated he can not bend over for too long because he becomes dizzy and gets migraine headaches. (Tr. 37). In addition, Plaintiff added that he cannot walk too long because his lower back starts to hurt. (Tr. 37). Plaintiff takes Tylenol 600 for his pain. (Tr. 37). Plaintiff used to work as a roofing laborer and stated that his not being able to bend over, as well as the throbbing pain in his ear, has prevented him from returning to that job. (Tr. 45).

2

Christopher Yep, a certified rehabilitation counselor, testified before the ALJ as a vocational expert. (Tr. 42). The ALJ posed a hypothetical to Mr. Yep concerning the employment available for an individual with certain characteristics and limitations. (Tr. 45-48). The ALJ proposed an individual who is 35 years old with a ninth grade education and borderline IQ, who has chronic otorrhea, and has had the first of two surgeries to treat this problem. (Tr. 45-46). The ALJ further stated that the individual has no functional hearing in his right ear and hearing loss in the left ear, is dizzy and can not bend or stoop repeatedly, and takes Tylenol 600 for pain relief. The ALJ asked what jobs would be available to a person limited to medium exertional work and who has non-exertional and environmental limitations as discussed in Plaintiff's testimony. (Tr. 46-51). Mr. Yep responded that several jobs exist that can be performed by a person with those limitations. (Tr. 50). The vocational expert characterized the individual's occupational ability as unskilled, light, sedentary work with no noisy or hazardous environments. (Tr. 49). Mr. Yep testified that such a person can perform some assembly and inspection jobs. (Tr. 50-52). For assembly positions, Illinois reports there are 65,494 jobs and 14,862 hand assembly jobs. (Tr. 51). For inspection positions, Illinois reports there are 24,457 jobs. (Tr. 51). The number of these jobs Plaintiff could perform were reduced in number due to his environmental limitations. (Tr. 50-52). Due to these limitations, Mr. Yep reduced these numbers by fifty percent for the number of positions that could be performed by a person with Plaintiff's limitations. (Tr. 51).

### III. **MEDICAL HISTORY**

Plaintiff has had a history of learning and hearing problems since he was a small child. (Tr. 252-260). While his school reports do not indicate a medical diagnosis of a Learning Disability, Plaintiff did take ability tests while in first, second, and third grade. (Tr. 258). In the first and second

3

grades, Plaintiff was given the Science Research Associates Mental Ability (SRA-PMA) intelligence tests using pictures. (Tr. 20). In first grade, Plaintiff scored a 70 on that test, and in second grade, he scored an 85. (Tr. 258). In the third grade, his school administered the Otis Lemon Mental Testing Ability Test and Plaintiff scored an 84. (Tr. 258).

While Plaintiff has had hearing problems since childhood, in October 1996, he started complaining of chronic right ear otorrhea, subjective bilateral hearing loss for 6 to 12 months, and a six month history of temporal headaches relieved by Advil. (Tr.205). He then underwent audiometry testing, which showed a mild hearing loss. (Tr. 205- 210). Plaintiff was also diagnosed with cholesteatoma and a deviated nasal septum. (Tr. 205- 210). At that time, Plaintiff's medical chart reflected a social history of smoking half a pack of cigarettes per day, alcohol consumption, and smoking crack cocaine. (Tr. 159).

Subsequently, on October 30, 1996, Plaintiff underwent a mastoidectomy, tympanoplasty, and septoplasty at Dallas County Hospital to remove the incus and malleus bones from his right ear and to resect the nasal septum. (Tr. 205-210). After the surgery Plaintiff experienced dizziness, memory loss, and further hearing problems. (Tr. 224). On February 3, 1997, Plaintiff was given an audiometric evaluation, which showed profound sensorineural hearing loss in the right ear and left ear with speech discrimination at one-hundred percent at 20 dbHL. (Tr. 160-162).

On March 10, 1998, Plaintiff was seen by Dr. Isaac Trejo for an audiological and otological evaluation. (Tr. 236). Dr. Trejo examined Plaintiff and diagnosed him with a serious hearing impairment which prevents him from communicating as well as a problem with persistent dizziness, likely secondary to the right ear problem. (Tr. 236). Dr. Trejo then requested that Plaintiff undergo an audiogram to be given by audiologist Dr. Lawrence Clayton. (Tr. 216-217).

This evaluation showed a relatively flat, severe, sensorineural hearing loss for the left ear; however, Dr. Clayton's finding showed that with a hearing aid, Plaintiff's hearing in the left ear was 96% at a normal conversational level. (Tr. 216). This evaluation also showed that Plaintiff was deaf in the right ear, as no responses could be elicited. (Tr. 216). Dr. Trejo later reported that Plaintiff's hearing loss was "moderate to severe" in the left ear and that he was deaf in the right ear. (Tr. 235).

Dr. Harold Best, a Disability Determination Services (DDS) consultative clinical psychologist, on March 16, 1998, administered a mental status examination and took a statement of Plaintiff's complaints and medical history. (Tr. 224- 226). Plaintiff told Dr. Best that he had headaches and throbbing in his head when he bends over, and that due to his hearing loss and back pain, he is unable to keep jobs once employers discover this hearing loss. (Tr. 224- 225). In discussing this past history, Plaintiff recited that he has a history of Special Education classes and was trying to teach himself how to read. (Tr. 224). At that time, Plaintiff said that he lived with his ex-brother-in-law. (Tr. 224).

Dr. Best found Plaintiff's orientation suspect and memory for recent events and long-term memory suspect. (Tr. 225). Dr. Best also diagnosed his funding of information as low, and his calculation skills deficient because he could not answer basic questions nor perform basic mathematical calculations. (Tr. 225). Plaintiff was also found to have poor judgment and insight. (Tr. 226). Dr. Best diagnosed Plaintiff with Likely Borderline Intellectual Functioning or Mild Mental Retardation. (Tr. 226). Dr. Best stated that due to Plaintiff's Special Education background, he recommended further intelligence testing. (Tr. 226). However, this intelligence testing was not performed because the ALJ found that such a test would not be highly productive and there was insufficient evidence to warrant an IQ test. (Tr.21).

5

Dr. Gover, on March 24, 1998, completed a Physical Residual Functional Capacity Assessment on Plaintiff and assessed him to have hearing limitations but no speaking, visual, postural, manipulative, or visual limitations. (Tr. 227-234). Dr. Gover stated that Plaintiff was required to avoid hazardous machinery and heights, as well as avoiding concentrated exposure to noise in the workplace. (Tr. 227-234).

On April 22, 1998, Dr. Wharton completed a Psychiatric Review Technique Form (PRTF) based on Listing 12.05 and Dr. Best's findings. (Tr. 237-245). Dr. Wharton found Plaintiff's daily activities and social functioning abilities were slightly limited. (Tr. 244). Plaintiff was found to often have deficiencies in concentration but no problems with deterioration or decompensation. (Tr. 244). Dr. Wharton found that no listing was met and that a Mental Residual Functional Capacity (RFC) assessment was necessary. (Tr. 237-245).

A Mental RFC assessment was performed on April 22, 1998, by Dr. Tomassetti, who concluded Plaintiff was capable of performing simple, routine work activities but not capable of performing detailed activities. (Tr. 246-248). Dr. Tomassetti also found that Plaintiff had a hearing impairment and borderline intellectual functioning. (Tr. 248). Dr. Tomassetti did find that Plaintiff's mental impairments had some slight impact upon his daily social and work activities. (Tr. 244). The last evaluation by a non-examiner was performed on August 28, 1998, by Dr. Wharton, who affirmed the previous PRTF findings and limitations. (Tr. 237-245).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or

6

substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision."

7

*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).

## V. FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in

---

[1] The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

8

substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

10

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset of the disability at any time relevant to his decision issued February 25, 2000. (Tr.13-25). Plaintiff did work, but that work was sporadic in nature. (Tr. 15). Thus, that work does not constitute substantial gainful activity.

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff has a hearing loss impairment, a history of a Learning Disorder, and a Borderline Intellectual Functioning Condition. (Tr. 24).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C. Step Three: Does claimant's impairment meet or medically equal to an impairment

11

in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr.24). Section 12.05C of the Listings of Impairments, as incorporated by Appendix 1, Sub-Part P, of 20 CFR §404 provides:

> 12.05 Mental Retardation: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

In order to establish a disability under Listing 12.05, this court interprets 12.05 to have two requirements. First, a Plaintiff needs to demonstrate significantly subaverage general intellectual functioning. Second, the Plaintiff needs to show that such functioning was initially manifested during the developmental period. Further, Section 12.05C has two requirements. The claimant must have an IQ score between 60 and 70, and the claimant must have another impairment which impairs a significant work-related function.

At the hearing, Plaintiff's attorney asserted Plaintiff met listing 12.05C - that he had Mild Mental Retardation (based on an IQ between 60 and 70) coupled with a hearing loss impairment. (Tr. 18). The ALJ found that Plaintiff could not meet Listing 12.05 because he did not meet Listing 2.08 regarding a hearing impairment, and he did not demonstrate the onset of the mental impairment before the age of 22. (Tr. 17). Listing 2.08- Hearing Impairments requires that Plaintiff has "hearing

not restorable by a hearing aid manifested by audiometry testing of air and bone conduction levels or speech discrimination deficits in the better ear." (Tr. 17). The ALJ found that according to Listing 2.08, the Plaintiff did not meet these requirements because, "while deaf in the right ear, [he] has achieved a 96% speech discrimination in his left ear at 50 decibels with a hearing aid." (Tr. 17).

Further, Plaintiff did not meet Section 12.05 because while Doctor Best may have diagnosed him as having a Borderline Intellectual Functioning or Mild Mental Retardation, Plaintiff did not provide substantial evidence of the onset of the impairment before the age of 22. Plaintiff tried to prove the onset of his impairment by showing "SRA-PMA" intelligence tests and Otis Lemon Mental Ability Tests that were taken in first, second, and third grades of schooling. (Tr, 20). Plaintiff's IQ scores were 70, 85, and 84, respectively. The ALJ gave little credence to the IQ score of 70. The ALJ noted the records and reports of the tests are incomplete. The scholastic report provides no record of the methodology nor accuracy of the IQ tests, thus the ALJ did not accept this score as an accurate IQ test result. Further, the 2 higher test scores that followed the score of 70 indicate the invalidity of the first score.

Plaintiff makes two arguments in his appeal to this court. Plaintiff contends that the ALJ improperly analyzed this section because he added a requirement that the IQ test needed to be performed before the claimant was 22 years old and that the ALJ did not develop the evidence. (Pl.'s mem. at 9).

This court finds that manifestation of the impairments before the age of 22 not an additional requirement of Listing 12.05 but rather an example of how one demonstrates subaverage general intellectual functioning manifested during the developmental period. The real issue is if the IQ test score of 70 is valid. The ALJ found that score was not reliable because of the lack of verification

13

of methodology, particularly given that within two years Plaintiff had scores of 84 and 85. This is substantial evidence which supports the decision of the ALJ.

Plaintiff also claims that the decision of the ALJ is erroneous because of the failure to have the Plaintiff sent for intelligence testing in order to fully and fairly develop the record. (Pl.'s mem. at 5). At the hearing, Plaintiff's attorney cited Dr. Best's impression and requested that Plaintiff be referred to a consultative examiner for IQ testing. (Tr. 18). The ALJ ruled against this motion because there would be no way to prove that current IQ scores accurately reflect Plaintiff's IQ more than 15 years ago, in other words, a current IQ score is irrelevant. (Tr. 21). This seems to this court correct - a current IQ test is of no help in making the 12.05 analysis.

In the context of a claim for social security benefits, the ALJ has a duty to develop the record fully and fairly. To meet this requirement in the case at hand, the ALJ considered Plaintiff's application for benefits, medical records, school records, Plaintiff's work experience, as well as his daily activities. (Tr. 20-21). In addition, Plaintiff was evaluated by a non-treating Disability Determination Services consultative psychological examiner, Dr. Harold Best. (Tr. 19). Further, Dr. Tomassetti and Dr. Wharton also reviewed the Plaintiff under Listing 12.05C. (Tr. 21).

Review of the totality of the evidence does not reveal that the ALJ did not fully and fairly develop the record. The ALJ found, based upon all the relevant evidence, that "there is insufficient evidence of record to warrant any additional examination or consultative IQ testing" to bolster Plaintiff's theory. (Tr. 21).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.   Step Four: Is the claimant capable of performing work which the claimant performed in

the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of his past relevant work. (Tr. 24). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E. Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

In performing the Analysis for Step Five, the ALJ determined that Plaintiff has the Residual Functional Capacity to perform a significant range of work at all exertional levels. (Tr. 24). The ALJ determined Plaintiff's Residual Functional Capacity was that he has no exertional (lifting carrying, sitting, standing or walking) limitations; he can occasionally bend; he can understand, remember, and carry out simple, but not detailed job instructions; due to his hearing loss, he is limited in his ability to interact with the public; he should avoid work at heights or around hazards; and he should not work near excessive noise levels or perform work requiring fine, bilateral auditory acuity. (Tr. 24). These limitations are supported by substantial evidence provided in the PRTF and RFC assessments performed by Dr. Wharton and Dr. Gover. (Tr. 17).

Therefore, the ALJ found that Plaintiff retained the RFC to perform a significant range of work at all exertional levels. (Tr. 24). The ALJ found that, "Plaintiff is capable of making a successful adjustment to work which exists in significant numbers in the national economy." (Tr. 23). The ALJ determined the Plaintiff is classified as a younger individual between the ages of 18 and 44, has a limited education, and has no skills that are transferable. (Tr. 24).

Upon considering Medical-Vocational Rules and Regulations and the testimony of the

15

vocational expert, there are a significant number of jobs in the national economy which he could perform, including working as an assembler and inspector. (Tr. 25). The vocational expert testified that for assembly positions, Illinois reports there are 65,494 jobs and 14,862 hand assembly jobs. (Tr. 51). For inspection positions, Illinois reports there are 24,457 jobs. (Tr. 51). Due to environmental limitations, Mr. Yep reduced these numbers by fifty percent for the number of positions that could be performed by a person with Plaintiff's limitations. (Tr. 51).

The finding of the ALJ as to Step Five of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Five of the Analysis is affirmed.

### VII. CONCLUSION

The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's motion for summary judgment on the administrative record and pleadings is hereby denied. Defendant's motion for summary judgment is granted.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/2/02